Samuel STERN, Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellee.

No. 78–1377.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1979.

Decided July 16, 1979.

Donovan M. Hamm, Jr., Baltimore, Md. (Peter H. Gunst, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for appellant.

David F. Albright, Baltimore, Md. (Richard M. Kremen, Christopher R. West, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee.

James H. Schropp, Asst. Gen. Counsel, Washington, D. C. (Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, Theodore S. Bloch, Atty., Washington, D. C., on brief), for amicus curiae Securities and Exchange Commission.

Neal L. Petersen, Gen. Counsel, Laura M. Homer, Chief Atty., John J. Sullivan, Atty., Securities Regulation, Div. of Banking Supervision and Regulation, Washington, D. C., on brief, for amicus curiae The Bd. of Governors of the Federal Reserve System.

Before BUTZNER, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is a suit by a disappointed long-time speculator to recoup, under federal security laws, from his broker the losses sustained by him as a result of certain option purchases made entirely on the speculator's own independent responsibility against the positive advice of the broker's representative. The plaintiff-investor has stated in separate counts of his amended complaint a number of grounds for recovery, only one of which is pertinent to this appeal, i. e., the count stating an alleged implied right of action for a violation by the defendant-broker of Regulation T,[1] in allegedly extending illegally credit for plaintiff's purchases. After joinder of issue and considerable discovery in the action, the defendant-broker moved for summary judgment on this count of the plaintiff's action. It supported the motion with an affidavit and with the discovery record. In a carefully reasoned opinion, the district judge concluded that no private claim for relief exists for violation of Section 7(c) and Regulation T and dismissed the count stating such claim, as set forth in plaintiff's amended complaint. On motion of the defendant, the district judge entered, pursuant to Rule 54(b), Fed.R.Civ.P., a final judgment granting summary judgment in favor of the defendant on the alleged action in this count. This appeal followed.

We affirm.

Section 7(c), the alleged violation of which provides the basis for the plaintiff's claim in the count under review, makes it unlawful for a broker, such as the defendant, to extend or maintain credit on any securities other than in conformity with the regulations issued by the Board of Governors of the Federal Reserve System.[2] Pursuant to the authority given it by this section, the Federal Reserve Board issued Regulation T fixing the terms under which brokers may handle transactions under the statute.[3] Neither Section 7(c) nor Regulation T provides a private right of action for

1. Section 220.4(c)(1)(i), issued under Section 7(c) of the Securities and Exchange Act, § 78g, 15 U.S.C., 12 C.F.R. § 220.1, et seq.

2. Section 78g(c), 15 U.S.C. provides in part: "It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section, * * *."

3. This regulation, as set forth in 12 C.F.R. § 220, so far as relevant here, was summarized in Note, *Civil Liability for Margin Violations—The Effect of Section 7(f) and Regulation X*, 43 Fordham L.Rev. 93 at 94 (1974):

"Regulation T governs the extension of credit by brokers. A purchase transaction carried out for a customer's special cash account complies with Regulation T if there is sufficient cash in the account at the time of the transaction, or the broker makes the purchase relying in good faith on the customer's agreement promptly to pay in full and his representation that he intends not to sell the security prior to payment. In addition, if payment is not made within seven business days after the purchase, the broker must 'cancel or otherwise liquidate the transaction.'"

its violation. The plaintiff asserts, however, that the courts have recognized such right, employing at various times two rationales, the reliance on which "has caused," in the language of one commentator, "great difficulties." [4] The first basis for such an implied right of action was founded on the tort principle declared in § 286 of the Restatement of Torts (1934).[5] It is generally described as the statutory tort or Restatement rationale and had its genesis, so far as Section 7 is concerned, in *Remar v. Clayton Securities Corporation* (D.Mass.1949) 81 F.Supp. 1014.

In *Remar*, the Court, paraphrasing § 286 of the *Restatement*, declared "that where defendant's violation of a prohibitory statute has caused injury to the plaintiff the latter has a right of action *if one of the purposes of the enactment was to protect individual interests like the plaintiff's.*" [6] It found that "the main purpose" of Section 7, was to regulate national credit policy and that any protection of the "small speculator" from individual loss by reason of its prohibition was merely a "by-product" of the statute's main purpose.[7] It grounded this finding on the statute's purpose on the

---

**4.** Note, *A New Rationale for Implying Private Rights of Action and Section 7 of the Securities Exchange Act of 1934,* 1975 *Wash.U.L.Q.* 1202 at 1203.

There has been said to be a third contractual basis for a Section 7 right of action under § 29(b) of the Securities Exchange Act (1934), 15 U.S.C. § 78cc(b). Liability under this theory, however, is subject to the common law equitable defenses. *Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assoc., Inc.* (4th Cir. 1974) 496 F.2d 1255, 1265–1267, *cert. denied* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297; *Pearlstein v. Scudder & German* (2d Cir. 1970) 429 F.2d 1136 at 1149 (Friendly, J., dissenting), *cert. den.* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); *Freeman v. Marine Midland Bank-New York* (E.D.N.Y.1976) 419 F.Supp. 440, 453. It may accordingly only be invoked by an "unwilling innocent party." *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (8th Cir. 1972) 469 F.2d 1166, 1182; *Drasner v. Thomson McKinnon Securities Inc.* (S.D.N.Y. 1977) 433 F.Supp. 485, 502; *Aubin v. Hentz & Co.* (S.D.Fla.1969) 303 F.Supp. 1119, 1121; *Stonehill v. Security National Bank* (S.D.N.Y. 1975) 68 F.R.D. 24, 30. Because of its limited scope and the plaintiff's obvious inability to qualify as an "unwilling innocent party," this basis of action was not invoked by the plaintiff and we are not concerned with it.

**5.** For further elucidation of this type of action, *see* Note, *A New Rationale for Implying Private Rights of Action and Section 7 of the Securities Exchange Act of 1934,* 1975 *Wash.U.L.Q.* 1202 at 1205:

"* * * At common law, four requirements had to be met for the violation of a statute to be tortious. First, the individual must have been harmed by an act proscribed by the statute. Second, he must have been in the class of persons the statute was intended to protect. Third, his injury must have been of the kind the statute was intended to prevent. Finally, the injury must have been to an interest that the statute was intended to protect."

**6.** Italics added, 81 F.Supp. at 1017.

**7.** The language of the Court was:

"Undoubtedly 'the main purpose' of § 7 of the Securities and Exchange Act was 'to give a government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market.' House Com.Rep. 73rd Cong., 2d Sess. No. 1383. But Congress recognized that 'protection of the small speculator by making it impossible for him to spread himself too thin * * * will be achieved as a by-product of the main purpose.'" 81 F.Supp. at 1017.

A fuller statement of the House Committee's explanation of section 7 is:

"The main purpose of these margin provisions in section 6 is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a byproduct of the main purpose.

"The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans and the New York call market." H.R.Rep. No. 1383, 73d Cong., 2d Sess. 7–9 (1934).

For an additional summary of the Report *see Bell v. J. D. Winer & Co., Inc.* (S.D.N.Y.1975) 392 F.Supp. 646, 652–53, n. 5.

House Report offered in explanation of the section, as drafted by the House Committee. Though *Remar* thus found that Congress had declared that the "small speculator's" protection was only a "byproduct" of the statute's "main purpose," such unintended but consequential "byproduct" result was sufficient in the Court's judgment to warrant the implication of a private right of action in favor of the *"small speculator"* as an intended "subsidiary" beneficiary of the statute.[8] The Court recognized, however, that such action, being one in tort, would normally be subject to the traditional tort requirement of causation and to the accepted defense of contributory negligence or *in pari delicto*.[9] Since the case came before it on a motion for dismissal, the Court found it premature to consider at that stage the applicability of the causation requirement, saying that "[a] decision on this point should abide the taking of the testimony."[10] It did, however, deal with the possible defense of *in pari delicto*. It noted that the statute's prohibition ran *solely* against the broker and then concluded that the defense of *in pari delicto* should not be available against the small and presumably unversed speculator because the statute, by directing its prohibition solely at the broker or lender assumed that the "small" borrower-investor was "incapable of protecting himself." [11]

This idea that the statute provided the "small speculator," with both a right of action and an immunity from the defense of *in pari delicto*, was upheld in later cases which adopted the statutory tort rationale. However, these cases generally emphasized that "recovery [in private cases under § 7] should be denied to the sophisticated trader on the ground that he [was] an accomplice in the violation" and because *"[d]enying him a remedy would serve as a greater deterrent to future violations * * * than an allowance of relief."* (Italics added) Comment, *Securities Exchange Act of 1934—Civil Remedies Based Upon Illegal Extension of Credit in Violation of Regulation T*, 61 *Mich.L.Rev.* 940 at 954 (1963);

---

**8.** 81 F.Supp. at 1017.

The author of the Note, *Federal Margin Requirements as a Basis for Civil Liability*, 66 *Colum.L.Rev.* 1462, 1470–71 (1966) (hereafter cited as *Margin Requirements*), which is generally cited as the most reliable discussion of Section 7 and its construction in this connection, questions the construction put on the House Report by the Court in *Remar* and suggests that Section 7, as evidenced by a more comprehensive review of the House Committee Report, was enacted "solely to provide" a "means of" regulating the aggregate credit available in the securities market, and "[a]ny protection of the small speculator from individual loss was merely consequential—a 'by-product.' "

**9.** The defense of *in pari delicto* is normally associated with contract actions; its counterpart in the tort context is the defense of contributory negligence. However, all the cases, even though based on a tort concept, have, beginning with *Remar*, spoken of the defense as *in pari delicto* and we shall do likewise. *See* Climan, *Civil Liability Under the Credit-Regulation Provisions of the Securities Exchange Act of 1934*, 63 Cornell L.Rev. 206 at 234, n. 152 (1978).

**10.** 81 F.Supp. at 1017.

This same position was taken in *Warshow v. H. Hentz & Co.* (S.D.N.Y.1961) 199 F.Supp. 581, at 582.

**11.** 81 F.Supp. at 1017.

This basis for holding the broker but absolving the customer was stated in *Avery v. Merrill Lynch, Pierce, Fenner & Smith* (D.D.C.1971) 328 F.Supp. 677 at 681 thus:

" * * * the ultimate responsibility [for obeying the statute] must be placed somewhere and Congress has indicated that it is with the brokers and dealers."

In announcing this principle, however, the Court felt compelled to add:

"It appears that in the instant case it may well be true that the plaintiff was not an 'innocent "lamb" attracted to speculation by the possibility of large profits with low capital investment,' but rather was aware of the margin requirements and nevertheless disregarded them. The Court deplores this type of alleged investor behavior and were not the mandate of Congress so unequivocal and the public considerations so strong, the Court might reach a substantially different decision than the one it does."

Likewise in *Naftalin Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra*, 469 F.2d at 1181, the Court said:

"Regulation T place[d] the burden of compliance squarely and solely upon the broker/dealers."

*Margin Requirements,* 66 *Colum.L.Rev.* at 1482–83; Note, *Pearlstein v. Scudder & German: Implied Rights of Action for Violations of Federal Margin Requirements and the Demise of the In Pari Delicto Defense,* 66 *Nw.L.Rev.* 372 at 376 (1972); *Goldman v. Bank of Commonwealth* (6th Cir. 1972) 467 F.2d 439, 446; *Royal Air Properties, Inc. v. Smith* (9th Cir. 1962) 312 F.2d 210, 213–14; *Serzysko v. Chase Manhattan Bank* (S.D.N.Y.1968) 290 F.Supp. 74, 88–90, aff'd. 409 F.2d 1360 (1969), *cert. denied* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180; *Moscarelli v. Stamm* (E.D.N.Y.1968) 288 F.Supp. 453, 459.[12]

Subsequent to *Remar,* a number of cases did deal with the causation issue which *Remar* had reserved for resolution at trial. In general, these cases followed the language of the commentator in *Margin Requirements.* In that article the author said that "[p]roof that the defendant's act 'caused' the plaintiff's loss is indisputably a prerequisite of recovery in tort [under Section 7]" and absent such proof, "recovery should be denied." [13] It has been stated that, in order to meet this burden, the plaintiff must show "that defendant's liberal offer of cred-

it induced him to purchase stock [or options] which he would not have otherwise acquired." *Landry v. Hemphill, Noyes & Co.* (1st Cir. 1973) 473 F.2d 365, 370, *cert. denied* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 reh. denied 415 U.S. 960, 94 S.Ct. 1492, 32 L.Ed.2d 576 (1974); *Junger v. Hertz, Neumark & Warner* (2d Cir. 1970) 426 F.2d 805 at 806, n. 1, *cert. denied* 400 U.S. 880, 91 S.Ct. 125, 27 L.Ed.2d 118; *Architectural League of New York v. Bartos* (S.D.N.Y. 1975) 404 F.Supp. 304, 315; *see, also, Continental Grain, Etc. v. Pacific Oilseeds, Inc.* (8th Cir. 1979) 592 F.2d 409, 412, n. 1.[14] In fact, it was argued in the first *Pearlstein* appeal, without apparent contradiction, that brokers had only been held liable theretofore under Section 7 where they had "*deliberately and wilfully* induced the investor to buy securities on the assurance of an unlawful extension of credit." [15]

*Remar* and its statutory tort theory of liability, with its causation requirement, remained the accepted basis for a private action under Section 7 until 1970.[16] In that year, the Second Circuit, drawing on the authority of *J. I. Case Co. v. Borak* (1964) 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423,[17]

**12.** *Royal Air* states this principle thus:
"The purpose of the Securities Exchange Act [in that case 10(b)] is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." (pp. 213–14)

**13.** 66 *Colum.L.Rev.* at 1471–72.

**14.** In *Landry,* the Court added in this connection (473 F.2d at 370):
"The plaintiff's proof on this issue, however, must of necessity be something less than definitive. His burden will most often be met by a showing that his financial position was such that he could not, or would not have complied with a request for margin in accordance with the federal rules."
The plaintiff, in his argument, attempts to take the position that he qualified under this rule as stated in *Landry:* he contends both that he did not have the financial resources to comply with the terms of his purchase and that the defendant knew this. Unfortunately for his argument, the facts demonstrate the falsity of such a claim, for the plaintiff did comply with his purchase. He was thus not without the resources to meet the financial requirements of his purchase, which is the subject of this ac-

tion. This point is developed in greater detail *infra.*

**15.** (Emphasis added) 429 F.2d at 1140.

**16.** *See* Note, *Pearlstein v. Scudder & German: Implied Rights of Action for Violations of Federal Margin Requirements and the Demise of the In Pari Delicto Defense,* 66 *Nw.L.Rev.* 372 at 376 (1972):
"Until *Pearlstein* it was undisputed that an action under section 7(c) was subject to the tort limitations of sections 286 of the *Restatement.*"
The plaintiff in his brief makes substantially the same statement:
"Indeed, prior to the decision of the Second Circuit in *Pearlstein I, infra,* every court considering the issue had followed the reasoning of *Remar.*"

**17.** The basis for the decision in *Borak* was explained in *Piper v. Chris-Craft Industries* (1977) 430 U.S. 1 at 32, 97 S.Ct. 926 at 944, 51 L.Ed.2d 124 thus:
"In *Borak,* the Court emphasized that § 14(a), the proxy provision, was adopted *expressly* for 'the protection of investors,' 377 U.S. at 432, 84 S.Ct. 1555, the very class

enunciated as a second theory for recovery against the broker under 7(c) what is generally described as the "enforcement" or "social policy" basis for an implied right of action.[18] Under this "enforcement" theory, an action is to be implied in favor of the intended beneficiaries of a statute where necessary to implement the statute's underlying purpose. Applying that language to the Section 7 situation, the Court proceeded to find, on the basis of the same House Report on which *Remar* had relied, that, though the real purpose of Section 7 was "the protection of the overall economy from excessive speculation" and "the protection of individual investors was a purpose only incidental" to that primary purpose, that "incidental" purpose was sufficient to make the individual investors "intended benefici-

aries" of the statute, properly entitled for that reason to invoke the statute as a predicate for a right of action in their favor. It, however, departed from the principle followed in the decisions which had adopted the *Remar* theory that any right of action under Section 7 should be reserved for the small, inexperienced investor. It declared flatly that the implied right of action under the statute was equally available to the experienced and knowledgeable trader as to the unsophisticated small speculator and that no amount of participation in the forbidden transaction by the experienced trader could bar his right to recover.[19] It justified this unusual, almost amoral result because the statute "forbid[s] a broker to extend undue credit but do[es] not forbid customers from accepting such credit." [20]

---

of persons there seeking relief." (Italics added)

*Borak* introduced a "two-pronged test for determining whether a private right of action in damages would be implied for a violation of a statute which did not expressly provide for such an action. The first question to be resolved under this test was whether the protection of the plaintiff was "one of the *main* purposes of the statute" and the second was could the "*main purposes*" of the statute be achieved absent private enforcement. *See*, Note, *Implied Private Actions for Federal Margin Violations: The Cort v. Ash Factors*, 47 Fordham L.Rev. 242, 248 (1978).

In *Cannon v. University of Chicago* (1979) —· U.S. —— at ——, 99 S.Ct. 1946, 1978, 60 L.Ed.2d 560, Justice Powell (dissenting) describes *Borak* as "both unprecedented and incomprehensible" and constituted "a singular and, I believe, aberrant interpretation of a federal regulatory statute."

**18.** *Pearlstein v. Scudder & German* (2d Cir. 1970) 429 F.2d 1136, *cert. denied* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971).

This description of the action is taken from the language of Justice Harlan's concurring opinion in *Bivens v. Six Unknown Named Federal Narcotics Agents* (1971) 403 U.S. 383, at 403, n. 4, 91 S.Ct. 1999, 29 L.Ed.2d 619. *See*, Note, *The Implication of a Private Cause of Action Under Title III of the Consumer Credit Protection Act*, 47 So.Cal.L.Rev. 383, 410 (1974). *Bivens*, it should be noted, involved a constitutional implication of a right of action and not a statutory implication. *Davis v. Passman* (5th Cir. 1978) 571 F.2d 793 at 813 (Goldberg, J., dissenting).

**19.** The Court predicated this departure from the rule in *Remar*, upon the following reasoning (429 F.2d at 1141):

"However, our holding does not turn on Pearlstein's subjective knowledge of the law. In our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission."

Such reasoning by the majority reached "a conclusion that shocks the conscience and wars with common sense," according to Judge Friendly, dissenting (429 F.2d at 1145). Fundamental morality seems to justify this criticism leveled by Judge Friendly at the decision, and such was the conclusion of the Court in *Gordon v. duPont Glore Forgan, Incorporated* (5th Cir. 1974) 487 F.2d 1260, 1263, *cert. denied* 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666, a case cited with approval by us in *Carras v. Burns* (4th Cir. 1975) 516 F.2d 251 at 260. In *Gordon*, the Court, after noting the first decision of the Second Circuit in *Pearlstein*, said:

"With all due deference to the Second Circuit, we must disagree with an approach that so unilaterally favors the stock purchaser at the expense of his broker."

**20.** 429 F.2d at 1141.

It found support for this ruling in *Perma Mufflers v. Int'l Parts Corp.* (1968) 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 which was an action to recover damages under the antitrust laws. It reasoned that, because in *Perma Life* coerced participation in an anti-trust violation by the plaintiff was thought not to bar his right to recover, it also operated to undermine

It is to be noted that under both the statutory tort rationale (*Remar*) and the enforcement rationale (*Pearlstein*) for a Section 7 implied right of action, establishment of the investor as an intended beneficiary of the statute was regarded as an absolutely essential element in finding any right of action in the investor's favor.[21] Protection of the private investor, however, was conceded in both *Remar* and *Pearlstein* not to have been a *primary* purpose of the statute. *Remar* quotes the legislative statement that at most such protection was a mere "by-product" of the main purpose of the statute. *Pearlstein* catalogues protection of the individual investor as "only incidental" to the legislative purpose. Nor is there any case—whether it adopted the Restatement rationale or the enforcement rationale—which departed from this conclusion as stated in both *Remar* and *Pearlstein*. Both of these cases, however, assumed and based their conclusions on a determination

that a mere "incidental" or "subsidiary" purpose to protect the individual investor would satisfy the "especial benefit" requirement phrased in the *Rigsby* case, which was the first authority for implying a private right of action under a federal statute.[22] Moreover, both theories justified their allowance of a right of action in favor of the customer against the broker, even though both the customer and the broker were involved in the illegal transaction, *because the prohibition of the statute ran against the broker and not against the customer.* In essence, the real practical difference between the two theories was that the statutory tort remedy allowed by *Remar* and its progeny, was reserved for the small, inexperienced trader whereas the "enforcement" remedy under *Pearlstein* was available alike to the inexperienced and the "unscrupulous" trader.

The rationales for both the tort basis, as expounded in *Remar*, and the enforcement

"the defense of *in pari delicto* in securities law cases." It conceded, though, that "*Perma Life* would apparently continue to deny recovery to plaintiffs who had not been coerced [in their participation in the anti-trust violation] but who had benefitted from the arrangement equally with the defendant * * *." Thus, if the reasoning in *Perma Life* were strictly followed, a plaintiff seeking to maintain a private action under Section 7 would have to prove he was "coerced" into making his purchase. Of course, the plaintiff in *Pearlstein* would have been unable to meet this burden. To overcome this difficulty in analogizing from *Perma Life*, the opinion distinguished the plaintiff in the Section 7 action from the antitrust plaintiff because, in the former the statutory prohibition invoked by the plaintiff as the basis of his action ran solely against the broker. 429 F.2d at 1141.

21. *See, Lank v. New York Stock Exchange* (2d Cir. 1977) 548 F.2d 61 at 65:
   "This long established rule is: that before a private right of action may be inferred the would-be plaintiff must show that he is within the class the statute is intended to protect, and that it is not sufficient merely to show that the defendant is within the class the statute is designed to regulate."

22. *Texas & Pacific Ry. Co. v. Rigsby* (1916) 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874. The language of the Court was:
   "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial

benefit the statute was enacted, the right to recover the damages from the party in default is implied * * *."
   It is somewhat paradoxical that, while *Rigsby* is cited as the progenitor of the doctrine of implied actions under a federal statute, subsequent cases have held expressly that the statute involved in *Rigsby* (*i. e.,* the Federal Safety Appliance Act) does not support an implied right of action. *Crane v. Cedar Rapids & I. C. R. Co.* (1969) 395 U.S. 164, 166, 89 S.Ct. 1706, 1708, 23 L.Ed.2d 176. In *Crane*, the Court said:
   "The Safety Appliance Act did not create a federal cause of action for either employees or non-employees seeking damages for injuries resulting from a railroad's violation of the Act."
   This later development in the construction of *Rigsby* is explained in Note, *Implying Private Causes of Action from Federal Statutes: Amtrak and Cort Apply the Brakes,* 17 B.C.Ind. & Com.L.Rev. 53, at 54, n. 10 (1975):
   "It has been suggested that *Rigsby* is not truly an implied remedy case. Gamm & Eisberg, *The Implied Rights Doctrine,* 41 U.Mo. K.C.L.Rev. 292, 293, n. 4 (1972). The authors note that *Rigsby* can be viewed as a negligence *per se* case in which the higher standard of conduct embodied in the federal statute was applied to an existing cause of action."
   *See, also,* largely to the same effect: Note, *Implying Civil Remedies from Federal Regulatory Statutes,* 77 Harv.L.Rev. 285 at 286 (1963).

basis, as expressed in *Pearlstein*, however, have been completely negatived by two subsequent developments in the law, one arising out of the legislative amendment of the statute and the other out of a number of recent decisions of the Supreme Court fixing for the first time the precise terms under which a private action for damages may be implied. Any decision dealing with the implication of a private damage action under Section 7 must take note of and conform to the rules for implication as fixed by these new developments or changes in the law unless to do so would work "manifest injustice" or there is a "statutory direction or legislative history to the contrary." This was impressed upon us by the Supreme Court in *Bradley v. Richmond School Board* (1974) 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476. This same principle was later declared and applied specifically in the implication area by the Court in *Cort v. Ash* (1975) 422 U.S. 66 at 77, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26. In *Cort*, the Court said:

> " ' * * * if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, * * *. * * In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside.' "

Nor is the rule limited merely to statutory changes. *Bradley* said unequivocally that the rule applies whether the change in the law be "constitutional, statutory, or judicial." [23]

The first of these developments, working a significant change in the possible implication of a private right of action under Section 7(c) was the addition of Section 7(f) to that Section in 1970. This new section of the statute renders the investor equally responsible with the broker for the observance of the margin requirements of Section 7.[24] Just as Section 7(c) makes it "unlawful" for the broker to extend credit in violation of the statute, so now Section 7(f) renders it similarly "unlawful" for the customer to "obtain, receive or enjoy" that credit. Both *Remar* and *Pearlstein* had predicated their implication of a private action in damages in favor of the investor on the ground that the Section 7 prohibition did not extend to the investor, *only* to the broker. This aspect of the statute indicated, it was urged, a legislative intent to favor the customer and to give him a right of action against the *only* party to whom the prohibition of the statute applied, i. e., the broker. The very fact that the investor was not included in the prohibition was taken as a legislative expression of the intent of the statute to protect him against the broker. However, this reasoning lost all weight when Section 7(f) was added to the statute. That amendment, with its drastic change in the status of the investor under the statute, was entirely inconsistent

---

**23.** 416 U.S. at 715, 94 S.Ct. 2006.

For instances in which the Court had, even on appeal, followed decisional changes in the law, *see, Hamling v. United States* (1974) 418 U.S. 87, 101–02, 94 S.Ct. 2887, 41 L.Ed.2d 590 and *Burt v. Abel* (4th Cir. 1978) 585 F.2d 613, 615.

**24.** The specific language of the amendment is, so far as relevant.

"(f)(1) It is unlawful for *any United States person*, or any foreign person controlled by a United States person or acting on behalf of or in conjunction with such person, to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender (without regard to whether the lender's office or place of business is in a State or the transaction occurred in whole or in part within a State) for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited if it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State." 15 U.S.C. § 78g(f). (Italics added).

To implement this new section, the Federal Reserve Board promulgated Regulation X, *which only became effective on November 1, 1971*, 12 C.F.R. § 224.

with any notion that the statute was intended for the investor's protection. No longer could it be fairly inferred that an investor could qualify as a statutory beneficiary of Section 7, entitled to invoke the statute as a basis for a private action in damages in his favor. Neither reason nor precedent can be marshalled in support of a conclusion that Congress, whose intent must be our polestar in this determination of implication *vel non*, ever intended that a statute, which regulated the action of the investor under threat of criminal sanctions, was to be used as a basis for inferring an action in favor of the investor. This follows inescapably from the language of the Court in *Piper v. Chris-Craft Industries, Inc.* (1977) 430 U.S. 1 at 37, 97 S.Ct. 926, 947, 51 L.Ed.2d 124. There the Supreme Court said that one whose conduct is regulated by a statute "can scarcely lay claim to the status of 'beneficiary' whom Congress considered in need of protection," an essential basis for inferring a private action in his favor under any statute. It is thus easy to understand why a recent commentator, after a penetrating analysis of the amendment's specific language and legislative background, has declared unequivocally that, after the enactment of Section 7(f) and the promulgation of its implementing Regulation X, a "damages action [for violation of Section 7] based upon either the tort

or *Borak* rationales should no longer be recognized," [25] since, to quote another commentator, "no one can seriously contend that a statute imposing criminal penalties on borrowers who participate in margin violations also seeks to protect those borrowers." [26] And the *Pearlstein* court seems to have recognized this, since it declared in the second appeal in that case, that [527 F.2d 1141, 1145, n. 3]:

" * * * the addition of section 7(f) to the Exchange Act * * * cast[s] doubt on the continued viability of the rationale of our prior holding." [27]

In *Utah State University, Etc. v. Bear, Stearns & Co.* (10th Cir. 1977) 549 F.2d 164, 170, *cert. denied* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176, a circuit court was faced squarely for the first time with the question about which *Pearlstein II* had expressed doubt, *i. e.*, whether, in the light of Section 7(f), the implication rule in *Pearlstein I* had "continued viability." It held flatly that the addition of Section 7(f) not only put in doubt the continued viability of the *Pearlstein I* Rule, but removed any justification for any longer implying a right of action in damages under Section 7. In that case, the court said that the addition of Section 7(f) to the statute and the issuance of Regulation X did just what the court in the second *Pearlstein* foresaw: they removed the un-

---

25. Comment, *Civil Liability for Margin Violations—The Effect of Section 7(f) and Regulation X*, 43 *Fordham L.Rev.* 93 at 106 (1974).

  *See, also*, Note, *ibid.*, 66 *Nw.L.Rev.* at 387 where the author said that after the enactment of § 7(f) "for a court to ignore the nature of the investor's participation would be to disregard the express conviction of Congress that investor conduct must be controlled."

  In Note, *ibid.*, 1975 *Wash.U.L.Q.* at 1229 the writer says: "If the effect of Section 7(f) is to read out completely the 'for the protection of the investor' language that the courts [in *Remar* and *Pearlstein*] developed, it is difficult to see how even an innocent investor could prevail" in a private action under Section 7. The writer does note that it might be argued, as *Palmer* later held [see infra] that the "innocent mistake" deference given in Regulation X would be sufficient still to support an action for the "innocent investor" because of a secondary purpose being implied for his protection. This, however, would lack any justification, even if

of arguable merit earlier, after *Cort*, as discussed *infra*.

26. Climan, *ibid.*, 63 *Cornell L.Rev.* at 255.

  *See, also*, Note, *Regulation X: A Complexis*, 50 *Notre Dame Lawyer* 136 at 154 (1974), where the author, though favorable to a continued right of action in favor of the "innocent lamb," says:

  "It is likely to be held that since the Federal Reserve Board provided that the borrower is liable for violation of margin regulations, it would be unjust to reward him for his wrongdoing."

27. The court found no occasion in this case, just as it had not in *Freeman v. Marine Midland Bank-New York* (2d Cir. 1974) 494 F.2d 1134, to consider the effect of such amendment in the case because it arose out of transactions which predated the effective date of § 7(f) and the implementing Regulation. This point is discussed subsequently in more detail.

derpinnings for any implied private right of action under Section 7. The court, in dismissing the action, proceeded to say [549 F.2d at 170]:

" * * * The responsibility for compliance with the margin requirements is now on the customer as well as the broker. *Pearlstein, Spoon* [478 F.2d 246], and *Landry* all concerned transactions occurring before the effective date of Regulation X. The statement in *Pearlstein*, 429 F.2d at 1141, that 'Congress has placed the responsibility for observing margins on the broker' no longer applies. When the *Pearlstein* case came back to the Second Circuit after remand, the court, after referring to the 1970 amendment and Regulation X, said in *Pearlstein v. Scudder & German*, 2 Cir., 527 F.2d 1141, 1145, n. 3:

"'The effect of these developments is to cast doubt on the continuing validity of the rationale of our prior holding.'

"Two district court decisions discuss at some length the impact of Regulation X on Regulation T. They are *Bell v. J. D. Winer & Co., Inc.*, S.D.N.Y., 392 F.Supp. 646, and *Freeman v. Marine Midland Bank-New York*, E.D.N.Y., 419 F.Supp. 440. In *Bell* the legislative history of the statutes underlying the two regulations is presented at length and we need not repeat it here. On the facts presented, *Bell* rejected the private implied cause of action asserted under Regulation T. *Freeman* agrees with the reasoning in *Bell*, but allows the private cause of action because the events giving rise to the action occurred before the promulgation of Regulation X. *Neill v. David A. Noyes & Co.*, N.D.Ill., 416 F.Supp. 78, which recognizes a private claim under Regulation T, is not pertinent because the complaint alleged fraud and deceptive conduct. See also *Lantz v. Wedbush, Noble, Cooke, Inc.*, D.Alaska, 418 F.Supp. 653, a decision pertaining to the defense of in pari delicto."

The plaintiff argues, though, that a "resounding majority" of the circuit court cases arising after the enactment of Section 7(f), in which the maintainability of an implied right of action in favor of the investor under Section 7 was in issue, had upheld the right of action. The circuit court cases cited by the plaintiff in support of this argument are *McCormick v. Esposito* (5th Cir. 1974) 500 F.2d 620, 621, cert. denied 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 842 (1975); *Spoon v. Wallston & Co., Inc.* (6th Cir. 1973) 478 F.2d 246, and *Landry v. Hemphill, Noyes & Co.* (1st Cir. 1973) 473 F.2d 365, cert. denied 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237. To these, amicus Securities Exchange has added, *Daley v. Capitol Bank and Trust Company* (1st Cir. 1974) 506 F.2d 1375, 1377; *Pearlstein v. Scudder & German, supra; Goldman v. Bank of Commonwealth* (6th Cir. 1972) 467 F.2d 439, 442, n. 2. What both the plaintiff and the amicus either overlook or disregard is that every circuit court case cited by them in this connection involved transactions which took place prior to the effective date of Section 7(f).[28] Section 7(f) was by its language not to be applied retroactively.[29] The circuit

---

**28.** The effective date of Section 7(f) was fixed by Regulation X as November 1, 1971. 12 C.F.R. § 224; *Bell v. J. D. Winer & Co.* (S.D.N.Y.1975) 392 F.Supp. 646, 652–53, n. 5; *Spoon v. Wallston & Co., Inc.* (E.D.Mich.1972) 345 F.Supp. 518, 521–22, aff'd. 478 F.2d 246.

In *Daley*, the transactions involved arose between December, 1968, and September, 1970, see 377 F.Supp. at 1066–67; in *McCormick*, the transactions arose "between July 10, 1968, and January 24, 1969." 500 F.2d at 622; in *Spoon*, the transactions occurred between May 6 and May 17, 1971, see 345 F.Supp. at 520; in *Landry*, the activities arose between the years 1962 and 1964, 473 F.2d at 368; and in *Goldman*, all

transactions took place in 1968, 467 F.2d at 442, n. 2.

**29.** *Utah State University, Etc. v. Bear, Stearns & Co.* (10th Cir. 1977) 549 F.2d 164, at 170; *Freeman v. Marine Midland Bank-New York* (2d Cir. 1974) 494 F.2d 1134, 1137–38, n. 4; *Freeman v. Marine Midland Bank-New York* (E.D.N.Y.1976) 419 F.Supp. 440, 452–53 (on remand); *Stonehill v. Security National Bank* (S.D.N.Y.1975) 68 F.R.D. 24, 41; *Theoharous v. Bache & Co., Inc.* (D.Conn.1977) Fed.Sec.L. Rep. ¶ 96,281. See, also, note 24, supra. Because of a "statutory direction to the contrary," *Bradley, supra*, would not require the application of the amendment to actions involving

court authorities cited by the plaintiff and amicus in this connection are thus not relevant. The only circuit court case involving transactions occurring after the effective date of Section 7(f), which has ruled on the effect of Section 7(f) on an implied right of action in favor of the investor under Section 7, is *Utah State* and that case held firmly against the implication of any such right of action.[30]

While there are no circuit court cases that differ in conclusion from *Utah State*, there are some few district court cases which have taken a different view of Section 7(f) from it.[31] Most of these are irrelevant because they arose out of transactions which antedated the effective date of Section 7(f).[32] The only one arising out of transactions subsequent to the effective date of Section 7(f) which has set forth in any detail specific reasoning in support of its contrary conclusion, is *Palmer v. Thomson & McKinnon Auchincloss, Inc.* (D.Conn.

1977) 427 F.Supp. 915. This decision finds in Section 7(f) "no intent to make small, unsophisticated investors responsible for complying with the margin requirements."[33] It extracts this absence of intent not from any language of the amendment itself but from a section of Regulation X issued under the amendment, which relieves a borrower from a finding of a violation in the case of "an innocent mistake  *  *  * if promptly after discovery of the mistake the borrower takes whatever action is practicable to remedy the noncompliance."[34] Based on this provision, the court reasons that Section 7(f) "restore[d] to the broker certain defenses based upon comparative fault, such as *in pari delicto*" but only against an "experienced trader who made his own investment decisions and was familiar with the margin rules." It adds, however, that for a party "[t]o prosecute an action [under Section 7] successfully, [after

transactions antedating the effective date of the amendment.

**30.** In the recent case of *Fryling v. Merrill Lynch, Pierce, Fenner & Smith* (6th Cir. 1979) 593 F.2d 736, 745, the issue was raised but the court did not find it necessary to "reach the question of whether Fryling could have a private right of action under the regulation" [*i. e.*, Regulation T]. However, in its footnote to this statement the court gave what appears to us to be a fair indication that it leaned strongly, if not entirely, in the direction of *Utah State* and the note in *Pearlstein II*, which had suggested doubt about the continued validity of the doctrine of *Pearlstein I* after the enactment of Section 7(f).

**31.** A number of these are noted and distinguished in *Utah State*, 549 F.2d at 167–69. The cases are *Palmer v. Thomson & McKinnon Auchincloss, Inc.* (D.Conn.1977) 427 F.Supp. 915; *McNeal v. Paine, Webber, Jackson & Curtis, Inc.* (N.D.Ga.1977) 429 F.Supp. 359, 365; *Freeman v. Marine Midland Bank-New York* (E.D. N.Y.1976) 419 F.Supp. 440, 452–53 (on remand); *Lantz v. Wedbush, Noble, Cooke, Inc.* (D.Alaska 1976) 418 F.Supp. 653, 655; *Neill v. David A. Noyes & Co.* (N.D.Ill.1976) 416 F.Supp. 78, 80; *Evans v. Kerbs and Co.* (S.D.N. Y.1976) 411 F.Supp. 616, 622–23, and *Jennings v. Boenning & Company* (E.D.Pa.1975) 388 F.Supp. 1294, 1298–99, *aff'd. on other grounds* 523 F.2d 889. These cases are discussed later in connection with *Cort v. Ash*.

**32.** Thus *Freeman v. Marine Midland Bank-New York* concerned a transaction antedating the

effective date of Section 7(f) and did not involve the application of that amendment. *Neill v. David A. Noyes & Co.* has been put in doubt by the decision in *Capos v. Mid-America Nat. Bank of Chicago* (7th Cir. 1978) 581 F.2d 676 at 679, discussed later. In *Evans v. Kerbs and Co.*, the court explained its decision thus: " *  *  * the gravamen of plaintiff's complaint is a fraudulent inducement to engage in margin transactions through knowing and willful misrepresentations of the applicable margin requirements." 411 F.Supp. at 624. For that reason the court in that case held it unnecessary to rule on the effect of Section 7(f), though it added, "[t]his Court is aware of the recent trend away from the rationale supporting these cases in light of the addition of Section 7(f) to the Act  *  *  *," 411 F.Supp. at 622, n. 11. *Jennings v. Boenning & Company* was like *Freeman*, it arose out of a transaction antedating the effective date of Section 7(f). Moreover, on appeal, the court of appeals reserved judgment on the issue whether a private action might be implied at all under Section 7. 423 F.2d at 889.

For an excellently reasoned district court case which, however, reaches the same conclusion as *Utah State, see Drasner v. Thomson McKinnon Securities, Inc.* (S.D.N.Y.1977) 433 F.Supp. 485, 500–01.

**33.** 427 F.Supp. at 921.

**34.** 12 C.F.R. 224.6(a).

the effective date of Section 7(f)] the plaintiff must demonstrate his good faith—that he acted innocently without knowledge that the transaction violated the margin requirements." [35]  It could be argued most persuasively that this language of the opinion is to be construed as placing on the investor the burden of establishing as an element of his cause of action that he was innocent and ignorant of the margin requirements.

The basic reasoning of *Palmer*—that is, that the provision of Regulation X in favor of the innocent investor suggests a legislative intent to imply a private right of action in favor of such innocent investor—was, however, considered and dismissed by *Utah State* and we are disposed to follow that authority.  In *Utah State*, the court said in that regard:

> "Under Regulation X, the broker is subject to criminal penalties and the customer is not, if the credit is obtained innocently and, if upon learning of the violation, he makes payment.  This difference in criminal penalties is no reason for imposing civil liability on the broker.  The imposition of that liability places the customer in a 'heads I win—tails you lose' position.  If the stock goes up, he takes his profit.  If it goes down, he recovers his loss from the broker.  Congress imposed the margin requirements to protect the general economy, not to give the customer a free ride at the expense of the broker."  549 F.2d at 170.

Amicus Securities Exchange goes even further than *Palmer* in an effort to denigrate any importance attaching to Section 7(f) in this regard.  It would argue inexplicably that the amendment had no effect on the earlier cases which had upheld an implied right of action under the statute and that those cases remained just as much viable precedents for implication after the enactment as they had been before, *even though those cases rested their decisions largely on the fact that the prohibition of the statute did not run against the investor, only the broker.*  It reasons that, since Congress did not expressly declare an intention of overruling the conclusions reached in those cases despite it removed an essential rationale for their conclusions, it is to be assumed that Congress did not intend, by enacting Section 7(f), to change the rule followed in those cases.  This is an argument, in essence, for ignoring Congressional change in the law and it is an argument which has received the imprimatur of no court.  *Palmer* certainly did not accept such argument, for it conceded, as we have noted, that Section 7(f) had limited the implication upheld in *Pearlstein* and it sought to find in the Regulation, issued under the authority of the amendment, only some lingering basis for preserving a cause of action for the "innocent investor."  Neither did *Pearlstein II*, as we have seen, assume that the amendment did not work a change in the possibility thereafter of implying a private action under the statute.  It would be unique indeed and without precedent in the authorities to imply a private right of action in favor of a person whose conduct was a violation of the very statute under which he was claiming a private right of action.[36]  It is idle to talk then, as the amicus' brief does, of precedents which antedated the amendment in 1970 of the statute.  This case must be decided, not on the law as it may have been understood prior to the amendment but, so far as actions based on conduct after November 1, 1971, on the change wrought in the statute by the amendment of 1970.  This is the lesson of *Bradley* and *Cort*, cited *supra*.  Construing the statute in this way, we feel constrained to give the amendment the same construction as did the court in *Utah State*.

It is, however, unnecessary to rely on the enactment of Section 7(f) as authority for the denial of a right of action in favor of the plaintiff under Section 7.  There is another development in the law—this time, judicial in character—which leaves no possible room for doubt about the absence of any such private right of action.  That develop-

---

**35.**  427 F.Supp. at 921 and 922.

**36.**  *See* note 49, *infra*, and *Piper v. Chris-Craft Industries* (1977) 430 U.S. 1 at 37, 97 S.Ct. 926.

ment is the declaration by the Supreme Court of definitive rules to halt the trend in circuit and district court decisions toward a free-wheeling implication of private actions to be observed in determining whether a private remedy is to be implied.

The generally accepted source for these definitive rules on implication is *Cort v. Ash* (1975) 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26,[37] which was the first authoritative "systematic analysis of, when and why a right of action [under a federal statute] should be implied,"[38] by the Supreme Court, though implied right of actions had been around for some sixty or more years. Until that decision, "no uniform set of standards had been devised by federal courts for determining whether to imply private actions for violation of a federal statute that grants no express remedy."[39] It did this by adopting "a strict approach" to implication generally. It gave effect to this approach by laying down express, clear-cut and precise requirements for an implied right of action under a federal statute. Such requirements are:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Pas-*

*sengers*, 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler*, 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); cf. *J. I. Case Co. v. Borak*, 377 U.S. 426, 434, 84 S.Ct. 1556, 1560, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394–395, 91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 559, 619 (1971); *id.,* at 400, 91 S.Ct., at 2006 (Harlan, J., concurring in judgment)." 422 U.S. at 78, 95 S.Ct. at 2088.

■ The first requirement for establishing an implied right of action on account of a violation of a federal statute, as thus enunciated in *Cort*—what is characterized as the "threshold test" for such an action,[40] and a test which "has been central to all implication cases, from the first statutory implication decision in which it [the doctrine] was originally formulated"[41]—is that the plaintiff be a member of a class "for whose especial benefit the statute was enacted."[42] "[S]atisfaction of the especial benefit criterion," [as declared in *Cort*] "is

37. This case was decided on June 17, 1975, prior to any transaction involved herein.

38. Note, *Private Rights of Action Under Title IX*, 13 *Harv.Civ.Rights—Civ.Lib.L.Rev.* 425 at 428 (1978).

39. Note, *Implied Private Actions for Federal Margin Violations: The Cort v. Ash Factors*, 47 *Fordham L.Rev.* 242–248 (1978).

40. This is Justice Stevens' characterization of this requirement in *Cannon v. University of Chicago, supra,* — U.S. at ——, 99 S.Ct. at 1953: "*First*, the threshold question under *Cort*

is whether the statute was enacted for the benefit of a special class of which the plaintiff is a member."

See, also, to the same effect *Lank v. New York Stock Exchange, supra* (548 F.2d at 65), which declares that, "the threshold question * * *: [is] for the benefit of whom was such regulation intended?"

41. *Davis v. Passman* (5th Cir. 1978), (*en banc*) 571 F.2d 793 at 814 (Goldberg, J. dissenting).

42. 422 U.S. at 78, 95 S.Ct. at 2088.

a *necessary*, but not a sufficient,[43] basis for obtaining an implied remedy." (Emphasis added)[44] And *Cort* gave a very precise statement of who might qualify and who might not qualify as a statutory beneficiary under this doctrine of a federal implied right of action. To qualify as a statutory beneficiary for whom a private action may be implied, it is not enough that the plaintiff "[has] a financial stake in the outcome of the case" or "[is] at least an incidental beneficiary" or is "secondarily benefitted,"[45] or that his protection is a secondary or a "subsidiary" purpose of the statute.[46] The requirement of *Cort* was specific: the protection and benefit of the party seeking such action must be the "primary congressional goal" of the statute,[47] or, as another has stated it, "the plaintiff must be the

'primary' beneficiary of the statute."[48] This was the reason the court in the later case of *Santa Fe Industries, Inc. v. Green* (1977) 430 U.S. 462 at 477–78, 97 S.Ct. 1292 at 1303, 51 L.Ed.2d 480, gave for the reluctance of the court "to recognize" an implied "cause of action * * * to serve what is 'at best a subsidiary purpose' of the federal legislation." *Piper v. Chris-Craft Industries* enlarged somewhat on the qualification which a beneficiary party under the doctrine of implied actions must have; it said that, "*a party whose previously unregulated conduct was purposefully brought under federal control by the statute * * can scarcely lay claim to the status of 'beneficiary' whom Congress considered in need of protection.*"[49] Such action can never be implied in the absence of "a clearly articu-

**43.** *Securities Investor Protection v. Barbour* (1975) 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263, is illustrative of a case where it was found that the private plaintiff was a member of the class intended thereby to be protected but was denied a right of action. The Court said in amplification:

"Congress' primary purpose in enacting the SIPA and creating the SIPC was, of course, the protection of investors. It does not follow, however, that an implied right of action by investors who deem themselves to be in need of the Act's protection, is either necessary to or indeed capable of furthering that purpose." 421 U.S. at 421, 95 S.Ct. at 1739.

**44.** Note, *Emerging Standards for Implied Actions Under Federal Statutes*, 9 *Mich. Journal of Law Reform* 294, 316–317 (1976).

In *Nussbacher v. Chase Manhattan Bank* (S.D.N.Y.1977) 444 F.Supp. 973 at 979, the Court used similar language:

"The Court [in *Cort*], apparently viewed the first factor [*i. e.*, 'especial benefit'] as the primary consideration, since after determining that protection of 'corporate stockholders was at best a subsidiary purpose' of the statute under consideration, *id.* at 80, 95 S.Ct. at 2089, the Court went on to note that the other relevant factors were either 'not helpful or militated against implying a private right of action.'"

**45.** Note, *Private Rights of Action Under Title IX*, 13 *Harv.Civ.Rights—Civ.Lib.L.Rev.* at 443.

**46.** Note, *Implication of Private Action from Federal Statutes: From Borak to Ash*, 1 *Journal of Corp. Law*, 371 at 384 (1976).

**47.** 422 U.S. at 84, 95 S.Ct. 2080.

Because of this language in *Cort*, the author in *ibid.*, 13 *Harv.Civ.Rights—Civ.Lib.L.Rev.* at 443, n. 101, suggests that *Pearlstein* is no longer good law.

This construction of "especial benefit" as "withdrawing the availability of implied remedies from secondary or incidental statutory beneficiaries" has the advantage that it "blunts the criticism that the inference of civil remedies constitutes a usurpation of legislative power since implied remedies will only be found in favor of plaintiffs whose interests are shown to be the primary concern of Congress in enacting the legislation." Note, *ibid.*, 9 *Mich. Journal of Law Reform* at 309.

*Lank v. New York Stock Exchange, supra,* 548 F.2d at 65. In the latter case, Judge Medina, speaking for a unanimous court, said:

"Even were we to agree with appellee that granting him a right of action against the Exchange would 'accord' with the purpose of the Exchange Act, our function here is to discern the intent of Congress, not to legislate in its place" and for the *would-be* plaintiff, the one "for the benefit of whom was such regulation [or statute] intended," no right of action is properly to be implied.

**48.** Note, *ibid.*, 1 *Mich. Journal of Corp. Law* at 384.

**49.** (Emphasis added) 430 U.S. at 37, 97 S.Ct. at 947.

*See,* the comment in Note, 66 *Nw.L.Rev.* at 387 that courts, in applying § 7 may not "disregard the express conviction of Congress [as expressed in § 7(f)] that investor conduct must be controlled."

lated federal right in the plaintiff." [50] Nor is this definition of the required "especial benefit" different substantially from that employed in *Borak*, if that case is carefully analyzed, for, as the court in *Piper* points out, *Borak* extended an implied remedy to "the *direct* and *intended* beneficiaries of the legislation, * * * the very class of persons" (emphasis in text) for whose protection the statute "was adopted *expressly*." [51] (Emphasis added) The definition is also consistent with our own decision in *Carras v. Burns*, 516 F.2d 251, 260, in which we, though dealing with a stock exchange regulation rather than a statute, used reasoning similar to *Cort* in denying plaintiff a right of action for a violation of a stock exchange rule.[52] To summarize, if the plaintiff claiming a private right of action for damages is not a member of the class intended primarily and not incidentally or secondarily, to be benefitted by the law, compensation in his favor would manifestly not further legislative goals, or be consistent with the evident legislative intent, and a private suit in his favor should not be implied.[53] Accordingly, the "threshold" hurdle which this plaintiff must surmount before he can successfully assert a right of action under Section 7 is that the protection of the class to which he belongs was the *"primary"* or *"main"* pur-

**50.** *Davis v. Passman, supra*, at 797.

This view of Judge Goldberg is approved in Comments, *Bivens Actions for Equal Protection Violations: Davis v. Passman*, 92 Harv.L. Rev. 745 (1979). The reasons for the distinction between implication based on a constitutional mandate and implication based on a statute, are stated with clarity by the Court in the recent case of *Davis v. Passman*, (1979), ——— U.S. ———, pp. ———————, 99 S.Ct. 2264, 60 L.Ed.2d 846.

**51.** 430 U.S. at 32, 97 S.Ct. at 944.

**52.** The pertinent language of the court was: "Margin maintenance requirements are established primarily to protect the solvency of brokers by assuring adequate collateral for their loans that finance customer speculation. *See Gordon v. duPont Glore Forgan, Inc.*, 487 F.2d 1260, 1263 (5th Cir. 1973); *Goodbody & Co. v. Penjaska*, 8 Mich.App. 64, 153 N.W.2d 665 (1967). Since they were not promulgated for the protection of investors, they create no cause of action. *Cf. Buttrey v. Merrill Lynch, Pierce, Fenner & Smith*, 410 F.2d 135, 142 (7th Cir. 1969); *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir. 1966); *see generally* Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum.L.Rev. 12, 29 (1966). The broker may be disciplined for violation of the margin rules, but he would be liable to his customer only if his breach of the rules also violates the Act by operating as a fraud." [516 F.2d at 260]

*See, also, S.E.C. v. American Realty Trust* (4th Cir. 1978) 586 F.2d 1001, at 1006.

**53.** *See* 13 *Harv.Civ.Rights—Civ.Lib.L. Rev.* at 441–44.

The brief of the amicus would enlarge the inquiry with reference to Congressional intent beyond a consideration of the "primary purpose" of the particular statutory provision itself and ground an implication on what it finds to be the general legislative scheme of the Securities Exchange Act as a whole. In developing this argument, amicus declares that the Securities Exchange Act itself is expressive of a Congressional intent that such Act was "to be interpreted as providing a private remedy" under any prohibitory or regulatory provision thereof." That argument was effectively answered by the Supreme Court in the recent case of *Touche Ross & Co. v. Redington*, (1979), ——— U.S. ———, ———, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82:

"The invocation of the 'remedial purposes' of the 1934 Act is similarly unavailing. Only last Term, we emphasized that generalized references to the 'remedial purposes' of the 1934 Act will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.' *Securities and Exchange Commission v. Sloan*, 436 U.S. 103, 116, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); see *Ernst & Ernst v. Hochfelder*, 425 U.S., at 200, 96 S.Ct. 1375, 1384. Certainly, the mere fact that § 17(a) was designed to provide protection for brokers' customers does not require the implication of a private damage action in their behalf. *Cannon v. University of Chicago, supra*, ——— U.S. at ———, 99 S.Ct. at 1953; *Securities Investor Protection Corp. v. Barbour, supra*, 421 U.S., at 421, 95 S.Ct. 1733, 1739. To the extent our analysis in today's decision differs from that of the Court in *Borak*, it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today. *Cannon v. University of Chicago*, ——— U.S. at ———, 99 S.Ct. at 1958. The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law."

pose of the statute, to accomplish which the statute was adopted "*expressly.*"

■ Unquestionably, the plaintiff as a private investor cannot satisfy this "threshold" test established by *Cort* for the implication of a cause of action in his favor under Section 7. This is so because a private investor is not a member of a class whose protection was the *primary* purpose behind the enactment of that statute, the test fixed by *Cort.* Nor have any of the authorities which have reviewed that legislative history reached any different conclusion. The two landmark cases in favor of an implied action under Section 7 (*Remar* and *Pearlstein*) certainly do not reach any different conclusion. *Remar,* as we have seen, saw Congress as recognizing the protection of the investor as only a "by-product" of the main purpose of the statute and it went no further than to hold that this mere consequential result makes the private investor a "subsidiary" beneficiary of the statute. *Pearlstein* does not even go that far: it labels the private investor as simply an "incidental" beneficiary. Judge Tyler in *Bell v. J. D. Winer & Company, supra,* is actually uncertain that Congress intended by Section 7 *any* benefit for the private investor. Commentators have uniformly expressed the same opinion that protection of the private investor was not the main or chief purpose of Section 7. In one of the earliest, if not the earliest comment on this question, Bogen and Krooss, *Security Credit,* 98 (Prentice Hall 1960) said:

"That margin regulation is designed primarily to regulate the use of credit rather than stock market activity or prices was stated in the law. Section 7 gives the Federal Reserve Board authority to regulate the extension of security credit 'for the purpose of preventing the excessive use of credit for the purchase or carrying of securities.' Moreover, it was only after extended Congressional debate that the administration of the margin provisions was assigned to the Federal Reserve Board, rather than to the Securities and Exchange Commission. The language of the statute and this assignment indicated that margin control, as adopted, was not designed primarily or specifically to protect the trader, small or large, from loss or to regulate the volume of speculation.

"Rather, control of margins was aimed principally at the broader and more attainable objective of contributing to economic stability by giving the Federal Reserve Board authority to apply selective control to specified forms of security credit, with a view to making quantitative credit control more effective. Only in the sense that it prevents increases or decreases in security loans that are so large as to give rise to wide price changes does margin regulation also contribute to the stability of the stock market."

The later comments in legal periodicals fully support the conclusions of Bogen and Krooss. Thus in 61 *Michigan Law Review* 940 at 947 (1963), the commentator, after reviewing the legislative history said that the "regulation of the use of credit and stabilization of the stock market would seem to constitute the primary objectives underlying the federal credit regulations, with the protection of the 'innocent lamb' as only a possible by-product." The comment in *Margin Requirements,* often cited by courts as authoritative, is substantially to the same effect:

"In short, the margin provisions as finally enacted were designed solely to provide 'a supplementary instrument of credit policy—one of the means of making a broad credit and monetary policy effective.' Any protection of the small speculator from individual loss was merely consequential—a 'by-product.' * * * These devices were not meant to protect the individual investor from his own folly; indeed, the importance of speculation to the economy was recognized and inferentially encouraged. The only indications of congressional intent to safeguard the interest of individual investors are isolated statements—made in justifying controversial and far-reaching legislation—by a Senate committee whose version of the margin provisions was rejected." [66 *Colum.L.Rev.* at 1470–71.]

Climan, 63 *Cornell L.Rev.* at 218, is perhaps more decisive. He says:

"Thus, although there is still ample room for debate as to which *macroeconomic* objectives section 7 was specifically designed to promote, it seems certain at least that Congress ultimately abandoned the objective of protecting individual investors."

As we have seen, *Cort* made it quite plain that a private action is only to be implied in favor of a member of a class for whose "primary" benefit the statute was enacted; specifically it declared that such action will not be implied for a member of a class whose protection is merely "incidental" to or a "by-product" of, or "subsidiary" to the statute's main purpose.[54] It follows that this action may not be implied in favor of the private investor under Section 7 and that neither the *Remar* nor the *Pearlstein* line of cases may any longer be considered

binding authority to the contrary. And this has been the conclusion reached by all courts *which have considered Cort in this connection*, with three exceptions.[55] The first of these three exceptions is *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (S.D.Ohio 1977) Fed.Sec.L.Rep. ¶ 96,239. The court in that case, however, actually concluded that an implied action under Section 7 was inappropriate under *Cort* but felt it should not so hold in view of the earlier decision by its own circuit court in *Spoon v. Wallston & Co., Inc., supra*, 478 F.2d 246;[56] it therefore certified the point for decision by the circuit court. The second exception is *Palmer v. Thomson & McKinnon Auchincloss, Inc.* (D.Conn.1977) 427 F.Supp. 915. That decision was properly dismissed as having been decided contrary to *Cort* in the Note in 47 *Fordham L.Rev.* at 252 with this comment:

" * * * The District of Connecticut, however, in apparent disregard of the

---

54. It is this rigorous requirement of "especial beneficiary" that distinguishes the requirement for implication from the requirement of standing. *See* Note, *Private Causes of Action Under Section 206 of the Investment Advisers Act*, 74 *Mich.L.Rev.* 308 at 315 (1975), and *Ash v. Cort* (3d Cir. 1974) 496 F.2d 416 at 426 (Aldisert, J. dissenting), *rev.* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

55. *Birotte v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (D.N.J.1979) 468 F.Supp. 1172; *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (S.D.N.Y.1979), 465 F.Supp. 1233; *Establissement Tomis v. Shearson Hayden Stone* (S.D.N.Y.1978) 459 F.Supp. 1355; *Nussbacher v. Chase Manhattan Bank* (S.D.N.Y. 1977) 444 F.Supp. 973; *Gluck v. Frankel* (S.D. N.Y.1977) 440 F.Supp. 1143; *Drasner v. Thomson, McKinnon Securities, Inc.* (S.D.N.Y.1977) 433 F.Supp. 485; *Theoharous v. Bache & Co., Inc.* (D.Conn.1977) Fed.Sec.L.Rep. ¶ 96,281; and *Schy v. Federal Deposit Insurance Corporation* (E.D.N.Y.1977) Fed.Sec.L.Rep. ¶ 96,242.

There are some cases other than *Gutter* and *Palmer*, decided after *Cort*, which continued to support implication of an action under Section 7. *McNeal v. Paine, Webber, Jackson Curtis, Inc.* (N.D.Ga.1977) 429 F.Supp. 359; *Freeman v. Marine Midland Bank-New York* (E.D.N.Y. 1976) 419 F.Supp. 440; *Lantz v. Wedbush, Noble, Cooke, Inc.* (D.Alaska 1976) 418 F.Supp. 653; *Neill v. David A. Noyes & Co.* (N.D.Ill. 1976) 416 F.Supp. 78, and *Evans v. Kerbs & Co.* (S.D.N.Y.1976) 411 F.Supp. 616. They all, however, completely disregarded *Cort* and made no attempt to apply the standards estab-

lished by the Supreme Court in that case. Under *Bradley, supra*, authorities which either overlooked or ignored intervening controlling decisions of the Supreme Court should be disregarded.

Moreover, *Neill v. David A. Noyes & Co., supra*, must be read in the light of *Capos v. Mid-America Nat. Bank of Chicago* (7th Cir. 1978) 581 F.2d 676 at 678–79:

"Neither the authorizing statute nor the regulation itself creates a private cause of action to enforce the regulation. In reliance on several decisions, the district court held that a private remedy was properly implicit in the statute and regulation. Mid-America, indeed, did not argue otherwise. It might well be questioned, after the guidance provided by *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), whether a private cause of action should be implied to enforce Regulation U. *See, e. g., Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir. 1977), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977); and *Theoharous v. Bache & Co., Inc.*, CCH Fed.Sec.L.Rep. ¶ 96,281 at 92,799 (D.Conn., September 7, 1977), both of which hold that Regulation T, which applies margin requirements to brokers, does not imply a private remedy."

56. *See, however, Fryling v. Merrill Lynch, Pierce, Fenner & Smith, supra*, n. 30, which suggests that the Sixth Circuit no longer considers *Spoon* controlling.

*Ash* [or *Cort*] standards, implied a cause of action despite acknowledging that investor protection was a byproduct of the statute. The court found that private investors are within the class intended to benefit from section 7, and that margin investors would go unreported absent private enforcement. That decision ignores section 7(f)'s clarification of the legislative policy subsequent to *Pearlstein,* and incorrectly equates incidental purpose with 'especial benefit.' "

The third case, *Panayotopulas v. Chemical Bank* (S.D.N.Y.1979) 464 F.Supp. 199, merely followed *Palmer* and adopted its reasoning.

The failure of the plaintiff to qualify as a member of the class for whose "especial benefit" the statute was enacted—that is, the failure to meet the "threshold" test for the maintenance of an implied private action in damages should be, as it was in *Piper* and *Cort,* dispositive of the plaintiff's claim to a right of action under Section 7. Such was the ruling in *Cort,* as the writer in 9 *University of Mich. Journal of Law Reform* at 308, explains:

> "The first requirement [under *Cort*] is that the plaintiff be a member of a class 'for whose *especial* benefit the statute was enacted.' A secondary statutory purpose of protecting the plaintiff or his class is insufficient to satisfy the especial benefit class. * * * *"

It "represents a departure from the *Borak-Wyandotte* intended beneficiary approach * * * ."

The holding in *Piper* is even clearer to this point, as the writer in the Note in 13 *Harvard Civil Rights-Civil Liberties Law Review* at 463, observed:

> "The *Cort* holding rested largely, and the *Piper* holding *completely,* on the determination that the plaintiffs in those cases were not of the especial class intended to be benefitted by the statutes in question." (Italics added)

Amicus Exchange Commission recognizes that the inability of the plaintiff to qualify under this "threshold" standard established by *Cort* is the "Achilles' heel" in its argument in favor of implication and seeks to find in the legislative history warrant for the conclusion that the protection of the private investor was "an important subsidiary purpose of the statute, if not an integral and controlling purpose of the section." It goes on to speak of the objectives of the statute as dual and identifies one of these dual purposes as the protection of the private investor. It reads *Cort,* not as requiring that the private plaintiff be a member of a class whose protection is the primary purpose of the statute, but merely that the plaintiff be someone who might "derive some substantial benefit from the statutory scheme beyond that received by the general public." Amicus, however, would put a gloss on *Cort* not warranted by the court's language and one which does not accord with any interpretation given *Cort* by any commentator. What *Cort* did and did clearly was to bar an implied action in favor of a "subsidiary" beneficiary and it is impossible to read *Cort* in any other way. Under amicus' contention, the plaintiffs in *Cort* and *Piper* would have prevailed. That, however, was not the conclusion of the COURT.

Nor does amicus' exposition of the legislative history of Section 7, as enacted in 1934, lend support to its argument that protection of the individual investor was a main purpose of the statute. In this exposition of legislative history, amicus makes no attempt to mark out the course of the legislative process leading to the final adoption of Section 7; it completely disregards the several revisions made in the proposed statute as it proceeded through the legislative process; it does not notice the criticisms leveled at the early proposals, particularly the Senate version, criticisms which have been discussed in all comments on the legislative history of the statute by legal scholars; it does not mention the conflict in purpose between the Senate and House versions of the proposed statute; it regarded apparently of no moment that the Senate version was abandoned and the House version, as explained in the House Report, was adopted by the Conference Committee

which resolved the conflict between the Senate and House versions, and that it was this House version, as accepted by the Conference Committee, which was finally enacted by the Congress as Section 7; and it regarded as irrelevant the statutory statement of legislative purpose as incorporated in Section 7(a), a statement which includes no reference to the protection of the trader. All this history had been carefully examined and set forth in great detail in legal articles for years. See Bogen and Krooss, *supra*; 61 *Michigan Law Review* at 945–47; *Margin Requirements*, 66 *Columbia Law Review* at 1467–71; Climan, 63 *Cornell Law Review* at 213–18, supra. It had been looked to in *Remar* and in *Pearlstein*, as well as in all the other authorities which had sought to extract legislative purpose from the legislative history. All had agreed that it was the final House version of the statute which they were called on to construe and that their construction of the statute must, therefore, accord with the legislative purpose as expressed in the House Report which represented the authoritative exposition of the statute by the House Committee which drafted the statute. Yet the amicus would ask that we reverse an unbroken line of judicial findings of legislative purpose behind Section 7, as set forth in this House Report, judicial findings stretching back over a period of forty years, and that we disregard the careful delineation of legislative history as made by legal scholars over the years and all on the basis of four isolated statements, taken out of context, no one of which can in reality give any support to amicus' thesis. Were it not that these four statements are quoted in the dissenting opinion, we would be inclined not to notice them. Because, however, they are set forth in the dissenting opinion, it would seem appropriate to indicate their inappropriateness as guides for the construction of legislative purpose behind the enactment of Section 7.

The first statement cited by amicus in support of its thesis is the testimony of Mr. Corcoran before the Senate Committee, to which the original Securities Exchange Act, introduced on February 9, 1934, had been referred. This version of the statute provoked "considerable criticism" and "[c]oncern was expressed [before the House Committee] that such provisions would have a deflationary effect upon an already depressed economy;" it was "[i]n response to such criticism, [that] Congress adopted the House's revision of the margin provisions; this development demonstrates that concern for the investor was wholly subordinated to the achievement of macro-economic objectives." *Margin Requirements*, at 1469. Accordingly, as Professor Climan has said, "[r]eliance on Corcoran's statement, however, seems misplaced." *Ibid.*, 63 *Cornell L.Rev.* at 217. Certainly, Mr. Corcoran's exposition of the legislative purpose of a proposed statute, which was specifically rejected by the Congress in favor of a revised statute with a completely different legislative purpose, is irrelevant to our consideration of the Congressional intent in enacting Section 7. The two excerpts from the remarks of Congressmen Rayburn and Sabath, cited by amicus, actually reinforce the findings of legislative purpose made by Judge Wysanski in *Remar* and other judges in subsequent cases. Congressman Rayburn was reporting the revised House version of Section 7 which was finally enacted by Congress. He included as a part of his remarks and as an authoritative statement of the statute and its purpose the House Report which had been prepared by his Committee and to which he had appended his name. It would be ironic, indeed, if we were to take some ambiguous statement made by him in submitting to the House the Committee Report as the authoritative statement on the construction of the statute and use that vague statement as a basis for contradicting the considered statement of the Committee, for whom Mr. Rayburn was appearing as spokesman and advocate. And the same can be said for Congressman Sabath, who rose to speak merely to support the House Report and the bill it recommended. The excerpt from a report of the Senate Committee is even more unreliable. It is taken from a report prepared *after* the passage of the Exchange Act and, as Pro-

fessor Climan has remarked, "may be interpreted as a response to the rejection of its own version of § 7 by the Conference Committee." *Ibid.*, 63 *Cornell L.Rev.* at 217, n. 55. These four items, which we have discussed, are the tiny fragments taken from the extensive legislative history by which the amicus would contradict the careful reconstruction of legislative purpose made over four decades by perspicuous jurists and legal scholars. They do not lend conviction to amicus' argument.

Nor, for that matter, would implication in this case satisfy any of the other factors stated in *Cort*, even were the plaintiff's failure to meet the "threshold" test to be passed over. *Cort's* second test is actually answered contrary to plaintiff's right of action by the answer to the "threshold" question since once he is found not to be a member of the class especially intended to be benefitted by the statute, Congressional intent not to create a remedy for him would be inferred. And this is particularly so since it is not to be assumed that a statute which extends its prohibition to an investor, as this statute does as a result of Section 7(f), was intended to provide that investor with a private right of action for violation of the statute. The third factor stated by *Cort* is whether a private remedy would be consistent with the purposes of the legislative scheme. This requirement was made more definite in *Piper* and *Sante Fe* by rephrasing the requirement in terms of whether the implication of a private right was "necessary to effectuate Congress' goals."[57] As we have seen, the primary purpose of Section 7 is to limit the aggre-

gate amount of credit which may be directed into the stock market and away from more economically productive uses. Implication of a private action in favor of a private investor would not necessarily promote that purpose, and certainly would not "effectuate Congress' goals" in enacting Section 7. The Exchange Commission in its Special Study of Security Markets at page 9, cited in its amicus brief in this case, recognizes this:

> "Losses to a given investor resulting from price declines in thinly margined securities are not of serious significance from a regulatory point of view."

This is no more than stating that an isolated violation of Section 7, while it might affect the private investor or broker, would not threaten any significant effect on national credit policy nor would it affect the allocation of credit in the securities market.[58] It would only be when such violations became so prevalent and widespread as to affect national credit policy that the goals of the statute would be threatened but this danger could be better realized through Exchange Commission enforcement than by a multitude of individual actions. It if be assumed that this requirement encompasses, also, a deterrence concept, implication is still not a necessary remedy. Judge Friendly in his dissent in *Pearlstein*,[59] made this clear and *Gordon v. duPont Glore Forgan, Inc., supra*, paraphrasing Judge Friendly, has made the same answer as Judge Friendly:

> "Any deterrent effect of threatened liability on the broker may well be more

---

57. *See Santa Fe*, 430 U.S. at 477, 97 S.Ct. 1302–1303 and *Piper*, 430 U.S. at 26, 97 S.Ct. 926.

It is interesting that the court underscored the element of "necessity" three times in *Piper*. Such emphasis indicates that in *Piper* the court was adding a significant gloss (*i. e.*, of necessity) to this third requirement of *Cort*. *See, Wilson v. First Houston Inv. Corp.* (5th Cir. 1978) 566 F.2d 1235 at 1239–40, U.S. appeal pending, and *Redington v. Touche Ross & Co.* (2d Cir. 1978) 592 F.2d 617 at 631, n. 6 (Mulligan, J., dissenting). However, in *Cannon v. University of Chicago, supra*, Justice Stevens, in his opinion phrases this third requirement as

"when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose." —— U.S. at ——, 99 S.Ct. at 1961. For this formulation, Justice Stevens did not cite *Piper* or discuss it but relied on other cases not strictly in line with the recent cases of the Supreme Court. Whichever formulation is used—whether that of *Piper* or that of Justice Stevens in *Cannon*—the result in this case is the same: implication is neither necessary nor helpful to the primary purpose of the statute.

58. 429 F.2d at 1148.

59. 429 F.2d at 1148.

than offset by the inducement to violations inherent in the prospect of a free ride for the customer who * * * is placed in the enviable position of 'heads-I-win—tails-you-lose.' "[60]

The final factor—which appears to be the least important and one not discussed in some cases—relates to whether a private action under the statute is "one traditionally relegated to state law." It may be conceded that there is no cause of action at state law for a mere act of selling stock on margin though plaintiff does allege a violation of the Maryland Securities Act. But, at least in this case, the plaintiff has alleged that the challenged transactions involved elements of a misrepresentation (*i. e.*, a failure to disclose material facts) or fraud, and he has set forth a common law action in fraud, which is an action traditionally relegated to state law. Thus, however viewed, the action alleged by the plaintiff in Count One of his complaint is not legally sustainable and the district court was right in dismissing it summarily for that reason.

■ The defendant, though strenuously supporting the reasons given by the district court for dismissing the count under Section 7 on the legal ground that implication can no longer be maintained under that statute, presses the additional point that, even if the changes wrought by the amendment of 1970 [*i. e.*, Section 7(f)] and the decisions in *Cort, Piper* and *Santa Fe* on the right to an implied remedy under Section 7, are disregarded, it was entitled to a summary judgment on the undisputed facts, developed both by affidavit and in discovery, on the challenged count. This is a perfectly legitimate argument. Recently, we reaffirmed the long-established rule that a decision of the district court is not to be reversed if it has reached the correct result, even though the reason assigned by it may not be sustained. *Eltra Corp. v. Ringer* (4th Cir. 1978) 579 F.2d 294, at 298. Accepting this principle, we have reviewed the undisputed record before the district court on the defendant's alternative motion for summary judgment. Based on that review, we conclude that the defendant would have been entitled to summary judgment on the facts of this case even under the law contended for by the plaintiff.

Basically, as we have seen, a plaintiff must be a "small, inexperienced" investor to meet the criterion fixed in *Palmer* for qualification as a plaintiff under Section 7. The plaintiff in this case meets the test neither of a "small" nor of an "inexperienced" investor. The plaintiff would, however, picture himself as a "small" and "inexperienced" investor, of limited financial resources, unversed in market trading, dependent on his broker in all his dealings, who had been misled to his ruin in speculation in stock options by greedy brokers selfishly seeking commissions without regard to the interests of their customer, the plaintiff. He attempts, as did the plaintiff in *Piper,* to cast himself in the role of "a hoodwinked investor victimized by market manipulation."[61] Nothing would appear further from the undisputed proof in the record, consisting, as it does in large part of the plaintiff's own testimony.

The plaintiff is a physician, carrying on an extensive practice through a professional association, owned wholly by him. This association is a large operation, with associates and extensive laboratory facilities. One of the facilities—a biochemical laboratory—is managed by plaintiff's wife who has a Ph.D. degree in chemistry. The income from this professional business to the plaintiff is substantial. He receives from the association a salary well over $100,000 a year. In addition, the association pays into a retirement and profit-sharing fund for the plaintiff about $30,000 a year. The association further declares dividends from time to time, though the record does not establish the amount of these. It is thus evident that the plaintiff is an individual with a very substantial income.

He has, also, a family corporation, the sole stockholders of which are himself, his wife and his two children. This family

---

**60.** 487 F.2d at 1263.

**61.** 430 U.S. at 45, 97 S.Ct. at 951.

corporation owns the building and facilities occupied and used by his professional association. It also has ownership of the plaintiff's home, as well as apparently other rental property in Baltimore City. The income of this corporation would appear to be substantial. It had in the year 1976 an income of $108,750, after paying a salary of $25,000 to the plaintiff's wife. It is of interest that the plaintiff drew from the corporate bank account the cash needed to clear the transaction, on account of which he has brought this action.

Clearly, as this undisputed record establishes, the plaintiff was and is a man both of·substantial means and of substantial earnings. The record at both the defendant's office and that of E. F. Hutton, the broker to whom he later transferred his account, indicated a worth for the plaintiff of from $500,000 to $1,000,000. And the estimate made by Hutton was made after the plaintiff had suffered the loss which is the subject of this action. The plaintiff does not flatly dispute these estimates; he does state that these estimates of his wealth were not gotten from him, though he is disputed in this by Roze, who was his account executive both at the defendant's branch and at Hutton. According to Roze, he inquired of the plaintiff on behalf of the defendant about the former's wealth and income before he began his option trading and these estimates are the consequence of those inquiries. But, irrespective of the dispute between Roze and the plaintiff, the undisputed fact is that the plaintiff makes no real effort to contradict the estimates of his wealth. Thus, it is clear from the admitted facts that the plaintiff is a man of wealth and of established earning power.

Neither can it be said that he is an "inexperienced" speculator. By his own testimony, he has been dealing in corporate stock since at least 1960, when he first established an account with the defendant. He conceded that as early as 1970 he was selling stock "short." [62] He began in 1972 trading in stock "puts" and "calls," a form of options. He recognized the speculative risks in such purely speculative trading, as he demonstrated by his own explanation of the procedure given in his testimony on discovery.[63] When trading in options began on the Chicago Exchange, he became an active trader in options on that Exchange. Between February, 1975 and April 6, 1976, for instance, he purchased 56 separate call options on the Chicago Exchange through the defendant alone. Nor were these small transactions. In March, 1975, for instance, he bought 400 Walt Disney options[64] for $182,376; within two weeks he sold these options for a profit of $108,031. By April 1, 1976, he had accumulated net profits of $140,000 as a result of his option speculations between February, 1975 and April 6, 1976. And on April 6, 1976, his account with the defendant showed a cash credit of approximately $220,000, and included General Motors options having a then market value of $190,000. The size of plaintiff's account and its activity confirmed Roze's testimony that plaintiff's trading account was one of the largest active accounts handled by the defendant at its Baltimore office. In fact, Roze in his testimony criticized the defendant primarily for its failure to give greater attention to such an active trader and customer as the plaintiff.

---

**62.** "Short" sellers "sell shares of a stock that they do not yet own but which they borrow from their brokers. If the stock goes down in value these traders realize a profit by then buying the stock to pay back the loan. Short sellers are essentially speculators, because they must eventually purchase shares to repay their brokers, i. e., to 'cover' the shares that they have borrowed. Persons buying long, on the other hand, need never purchase additional shares, because they can wait out a movement in the stock price that has been unanticipated. Moreover, the potential loss for long sellers is no greater than their actual investment, but the potential loss for short sellers is unlimited." Hacker & Rotunda, *SEC Registration of Private Investment Partnerships After Abrahamson v. Fleschner*, 78 Col.L.Rev. 1471 (1979).

**63.** " * * * in the case of a 'put' you are limited to your investment. You can lose only your investment. But, in the case of a short, you can lose more than your investment, I think." A. 795–96.

**64.** One option covers 100 shares.

Nor did the plaintiff rely on his broker for advice in his market operations. He made it very clear in his testimony that he neither invited nor welcomed advice from his broker. He declared unequivocally that every trade made by him on the market was his own decision without any suggestion from his broker.[65] There is thus no basis whatsoever for any finding that the defendant had anything to do with any purchase of options, whether profitable or otherwise, by the plaintiff. In his brief, the plaintiff makes some point of the fact that he had no financial library. But, whether he did or not, the plaintiff unquestionably considered himself knowledgeable and experienced about the market, without any need for advice; and he had actively and substantially traded in the market for years, with varying success.

The plaintiff was also a knowledgeable trader, well acquainted with market rules, including Regulation T under Section 7. The contention, for instance, that the plaintiff did not know what a Regulation T call was is incredible in the light of the plaintiff's long experience in the market. He had received innumerable Regulation T calls. And he had complied. Moreover, he knew exactly how option purchases had to be financed. He knew that options could not be purchased on margin. He found this out on the very first purchase of an option contract made by him through the defendant in March, 1975. On this occasion, the plaintiff wished to purchase certain Walt Disney call options. He inquired of his account executive, Roze, how many he could purchase on the basis of his then account with the defendant. Roze calculated inaccurately the number of options the plaintiff could purchase by using "a buying power [text] instead of using what they call SMA, which is cash available." As a result of this error, "twice as many options as should have" were purchased by Roze for the plaintiff, resulting in an immediate "maintenance call or T call" on the plaintiff for $35,000 by the defendant.[66] Following

---

**65.** His testimony on this point is:

"At the beginning I had no experience whatsoever, and Mr. Farley used to call me, and give me all kinds of information, and tell me what he thinks and what he feels, and sometimes also to do some sales talk. I didn't like it.

"I felt I should make my own decisions. My own philosophy about the stock market was such that those so-called counselors and advisors, and those people who are selling this advice, if they have been so competent and so knowledgeable they probably will do their own trading rather than sell or advise. I decided to make my own decisions.

"I asked him to please not call unless it's something I asked for, and something worthwhile telling me, but no sales talk, and please not to talk to my wife about my trading." A. 157.

**66.** This transaction was explained by Roze in his testimony thus:

"Well, because through inadvertent error, we purchased twice as many options as should have, we used a buying power instead of using what they call SMA, which is cash available, and immediately we got either maintenance call or T call, I forget, and the next morning I was right in there talking to Bill Waters.

\* \* \* \* \* \*

"The buying power gives you the right to buy stock. In other words, if you have fifty dollars in cash, and stock bought at margin, you can buy a hundred dollars, if the margin is fifty percent. Therefore, when they give you buying power, that means you can buy stocks to the full extent of the buying power, and the new stock you purchase is on margin, whereas options cannot be margin, they have to be paid in full in cash. Therefore-and on this purchase here, I gave him the wrong figures, I gave him the buying power which he said okay, buy the limit of the buying power, the limit of that sum, whereas it should have been half of that, SMA." A. pp. 537–38.

"Well, this was the first order he made, he told me to find out how many, you know, the amount of money we can use to—how many options he could buy with the money in the account. Something of that nature. And I gave him the figure, and he told me to buy, I believe it was, 70—I believe it was 70 options of Disney. The next day, we had, I think, a T call, or a maintenance call for $35,000, and, of course, I was shocked because by the figures given to me that I used, it should not have been. It was well-covered. Well, that's when we realized that he was using the buying power instead of SMA, or the cash equivalent to buy the options. I called him immediately back and, of course, he was not there, he was gone for the whole week. I couldn't contact him. The options were going down. And, of course, I mean, right as soon as this happened, I walked in with Bill and—or ei-

some delay, caused by the plaintiff's absence, Roze explained the error to the plaintiff and the plaintiff dismissed the whole incident as "a mistake," [67] and accepted his losses without batting "an eyelash." [68] Considering this experience, it is futile for the plaintiff to argue that he did not understand that he could not trade in options on credit, or that he did not know what a Regulation T call was.

When the plaintiff made his purchase of 300 IBM call options on April 6, 1976—the transaction which gives rise to the losses for which he seeks recovery in this action—he thus did so as an experienced, knowledgeable trader, fully cognizant of the terms on which options could be purchased. Moreover, he did so on his own independent responsibility. Actually, Roze, the account executive to whom he gave this order originally on April 5 sought to dissuade the plaintiff from purchasing so heavily in options which would expire in about two weeks. Roze was successful in inducing the plaintiff to delay but on the next day, the plaintiff directed Roze to execute the order: "there was no room for discussion, it was just: do it," was Roze's description of the order received by him on April 6 from the plaintiff. In accordance with what he said was his unusual practice, Roze then discussed with the plaintiff how he was going to pay for these options. In that discussion, there was reference to "how much money he [the plaintiff] had available in his account" at the time (i. e., about $220,000). The plaintiff stated he was selling his 355 General Motors options with a then worth of approximately $190,000, and he apparently gave an order to sell these options. The existing cash balance in plaintiff's account, together with the proceeds of the sale of the General Motors options, would have left a small balance of a few thousand dollars which plaintiff "said he would take care of." Through the sale of General Motors options, the use of his cash balance, and a relatively small cash payment from the family real estate corporation, the plaintiff did liquidate the purchase in much the way he indicated to Roze at the outset of the transaction that he would.[69]

The plaintiff was unable in his own testimony to point out how the defendant had violated Regulation T. It was suggested that Regulation T was violated if the broker did not collect payment from the trader at the time the former accepts an order from the investor. We do not read Regulation T to that effect. A broker must under Regulation T, in accepting the order, assume that the purchaser in good faith will pay within a reasonable period after the order is given. There is nothing in the record to indicate that this was not so in this case. The plaintiff had more than half the purchase price of the IBM options in his cash account with the defendant. He also had in his account General Motors options with a cash value at the time of approximately $190,000, which he directed the defendant to sell and apply toward the purchase of IBM options. The only reason this sale was delayed was that the plaintiff placed limit sale orders on the General Motors options and the options fell below this limit. Had the General Motors options been promptly sold as expected, the remaining balance on the purchase would have been small. There was thus every indication that the plaintiff could and would pay within the time fixed under Regulation T, just as he had stated he would to Roze.

ther he was there, or, anyway, Bill Waters was notified, and he says well, you better get hold of him, you know, because you're it." A. 621–22.

67. A. 624.

68. A. 617.

69. The plaintiff argues that a few days prior to April 6 the plaintiff had purchased a smaller block of IBM options, had not paid for them

immediately but had sold them within two days after purchase within the grace period for payment, realizing a profit in the transaction. This represented, in the view of the plaintiff, a "free ride" being secured by him at the expense of the defendant. We are uncertain that this contention finds support in the record but, if it does, it merely confirms the conclusion earlier arrived at that the plaintiff was not an unversed market speculator.

The intimation by the plaintiff that he was unable to pay for the large purchase of IBM options and the defendant knew this is manifestly not borne out by the record. The plaintiff showed he had ample resources to meet the payment required for this purchase. Even after the IBM options had depreciated from $417,000 to $43,000 and the General Motors options by a number of thousands of dollars, the plaintiff met his Regulation T call by paying into his account an additional $23,000. It is idle for the plaintiff to contend he was unable to pay for the purchase under this record. What the record does show is simply that he made a bad speculation—but the responsibility for this was his and only his.[70]

The plaintiff raises another claim of a violation of Regulation T. He says that he had been engaged in "free-riding" just before his purchase of the IBM options.[71] The plaintiff argues that under Regulation T the defendant should have frozen his account because of his [the plaintiff's] "free-riding." The difficulty with this, though, is that the defendant's records, which cover these transactions, do not support the factual basis for the argument nor has the plaintiff pointed to anything that would establish otherwise. It is true we are concerned with a motion for summary judgment but even here, the opposing party cannot stand silent when the record, as made by the other side, puts in issue a fact determinative of a vital issue in the case. The plaintiff was under an obligation to show how the defendant's records were inaccurate. He did not. We cannot assume under those circumstances a violation of Regulation T.

*Palmer* suggests that, whether the plaintiff can qualify as a "small, inexperienced" investor or is to be regarded as a knowledgeable speculator, is normally a factual question not to be resolved on motion for summary judgment. But in this case, the record is so abundant and so indisputably clear that the plaintiff was a knowledgeable investor that the district court would have been entitled to grant summary judgment on the ground that the undisputed facts established, under any possible theory of liability, that the plaintiff was not entitled to assert a right of action under Section 7.

Both for the reasons assigned by the district court and on the further ground that under the undisputed facts, the defendant would have been entitled to summary judgment, even if there was an implied right of action, the judgment below is

AFFIRMED.

BUTZNER, Circuit Judge, dissenting:

The principal issue in this appeal is whether investors have a right of action against their brokers for violation of the margin requirements of § 7 of the Securities Exchange Act of 1934 and Regulation T which was promulgated by the Board of Governors of the Federal Reserve System pursuant to that section.[1] The district court held that such a right of action does not exist. I would reverse this ruling because I believe that Congress has impliedly authorized private suits of this type by investors who are not knowing participants in their brokers' violations of the law. Much has been written on this subject, and Judge Russell's scholarly opinion fairly surveys this literature. Consequently, the outline of my views can be brief.

---

**70.** It is obvious he does not meet the causation standard established in *Landry* [*see* note 14]. He clearly had the resources to support his purchase, did not rely on any promise of credit, and made his own decisions.

**71.** A "free-ride" in stock trading occurs when a trader, taking advantage of the grace period under Regulation T, buys stock and sells it within the grace period without ever having paid for the stock.

**1.** *See* Securities Exchange Act of 1934, ch. 404, § 7, 48 Stat. 886 (current version codified at 15 U.S.C. § 78g (1976); Regulation T, 12 C.F.R. § 220 (1978).

Section 7(c) of the Act, which makes it unlawful for a broker to extend credit in violation of the margin requirements, is set out in pertinent part in n.2 of the majority opinion.

In determining whether a private remedy is implicit in a statute which does not expressly provide one, we must follow the principles explained in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The controversy in this case principally involves *Cort*'s first criterion: that is, whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted." 422 U.S. at 78, 95 S.Ct. at 2088. I believe that there can be little doubt that in 1934 Congress intended § 7 to benefit investors who establish margin accounts. Although Congress primarily sought to regulate the use of credit for the public welfare, this was not the exclusive reason for enacting § 7. The legislative history discloses that another purpose was to afford protection to individual investors. Quite understandably in 1934, Congressmen did not use the same phrases found in the 1975 *Cort* opinion. Nevertheless, without speaking in terms of the "especial benefit" the statute afforded investors, Congress made clear its intention to protect this class.

In introducing the House bill, Representative Rayburn, Speaker of the House and Chairman of the House Committee on Interstate and Foreign Commerce, declared:

It [§ 7] deals with the all-important problem of credit control or margins. I have from the beginning considered this problem paramount. A reasonably high margin requirement is essential so that a person cannot get in the market on a shoe string one day and be one of the sheared lambs when he wakes up the next morning.[2]

Representative Sabath also stressed investor protection:

I am of the opinion that in view of the fact that we cannot, . . . prohibit speculation or gambling, that it is our duty to see that the investing public, or rather the "lambs", be protected by this

Government so that their investments shall not be wiped out even before the receipt of the stock certificates issued to them.[3]

Thomas Corcoran, testifying as a spokesman for those who drafted the Act, informed the Senate Committee that:

Of course, you have two purposes to serve when you are dealing with margins: One is to protect the lamb; another, and probably the more important of the two, although it does not appeal to one's human instincts as completely, is the protection of the national business system from the fluctuations that are induced by fluctuations in the market, which in turn stem back to this very exquisite liquidity you get when you have a lot of borrowed money in the market.[4]

The Senate committee report accompanying the Act similarly demonstrated concern for individual investors:

By the development of the margin account, a great many people have been induced to embark upon speculative ventures in which they were doomed to certain loss.

The ease and celerity with which such a [margin] transaction is arranged, and the absence of any scrutiny by the broker of the personal credit of the borrower, encourage the purchase of securities by persons with insufficient resources to protect their accounts in the event of a decline in the value of the securities purchased. Many thoughtful persons have taken the view that the only way to correct the evils attendant upon stock market speculation is to abolish margin trading altogether. A Federal judge furnished this committee with instances from his long experience on the bench, indicating that a large proportion of the business failures, embezzlements and even suicides in recent years were directly attributable to

**2.** 78 Cong.Rec. 7700 (1934).

**3.** 78 Cong.Rec. 8011 (1934).

**4.** Stock Exchange Practices: Hearings on S.Res. 84, S.Res. 56 and S.Res. 97 Before the

losses incurred in speculative transactions.[5]

Finally, a Senate committee report on stock exchange practices released ten days after the passage of the Act articulated the purposes of the margin regulations as follows: · ·

> The provisions are intended to protect the margin purchaser by making it impossible for him to buy securities on too thin a margin, and to vest the Government credit agency with power to reduce the aggregate amount of the Nation's credit resources which can be directed by speculation into the stock market . .[6]

Thus, the legislative history of § 7 of the Securities Exchange Act of 1934 discloses a dual intent on the part of Congress to regulate credit and to protect investors.[7] Apart from its concern about national credit resources, Congress intended to protect and benefit investors as a special class, distinct from the general public.

Influenced in part by the Act's legislative history, courts generally held that § 7 impliedly created a private right of action.[8] Courts differed, however, over whether to allow recovery to investors who knowingly participated in a violation of the margin laws.[9] Congress ended this controversy when it enacted § 7(f) in 1970.[10] This amendment makes it unlawful for an investor to violate the margin requirements established by the Federal Reserve Board.

The amendment evidenced no intention to penalize innocent investors, and the Board, which is authorized to implement the statute, expressly exempts them.[11]

I therefore conclude that §§ 7(c) and 7(f), read together, satisfy *Cort*'s first test for determining whether innocent investors may sue their brokers for margin violations.

*Cort* next asks whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." 422 U.S. at 78, 95 S.Ct. at 2088. I think the passage of § 7(f) in 1970 provides a fair indication of Congress' implicit intention to recognize the legitimacy of private suits. By enacting § 7(f) Congress dealt with the obligation of investors to abide by margin restrictions against a background of case law that for nearly 20 years had established the right of investors to sue their brokers for violation of these restrictions. Nevertheless, Congress did not expressly proscribe private suits by innocent investors when it passed § 7(f). Nor does the legislative history of § 7(f) refer to any intention to prohibit an implied private cause of action on the part of investors. The inference that can be drawn justifiably from such action was recently illustrated in *Cannon v. University of Chicago*, —— U.S. ——, 99 S.Ct. 1946, 60 L.Ed. 560 (U.S. May 14, 1979). That case raised the question of whether a private cause of action may be implied under Title IX of the Education

---

Senate Committee on Banking and Currency, pt. 15, 73d Cong., 2d Sess. 6494 (1934).

**5.** S.Rep.No. 792, 73d Cong., 2d Sess. 3, 6–7 (1934).

**6.** S.Rep.No. 1455, 73d Cong., 2d Sess. 11 (1934).

**7.** H.R.Rep.No. 1383, 73d Cong., 2d Sess. 7–9 (1934), quoted in the majority opinion at n.7, which identifies the main purpose of the margin provisions as regulation of the nation's credit resources, does not negate other portions of the legislative history which reflect a dual purpose of credit regulation and protection of investors.

**8.** *See, e. g., Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (1st Cir. 1973); *Spoon v. Walston & Co.,* 478 F.2d 246 (6th Cir. 1973); *Pearlstein*

*v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970).

**9.** *See generally* 2 Loss, Securities Regulation 1263–65 (1961); 5 Loss, Securities Regulation 3299–3307 (1969).

**10.** 15 U.S.C. § 78g(f) (1976). Section 7(f) is quoted in n.24 of the majority opinion.

**11.** Regulation X, at 12 C.F.R. § 224.6(a) (1978), provides that:

> An innocent mistake made in good faith by a borrower in connection with the obtaining of a credit shall not be deemed to be a violation of this part (Regulation X) if promptly after discovery of the mistake the borrower takes whatever action is practicable to remedy the noncompliance.

Amendments of 1972. Pointing to the similarity between Title IX and Title VI of the Civil Rights Act of 1964 and the well recognized implied private remedy under Title VI, Mr. Justice Stevens said:

It is always appropriate to assume that our elected representatives, like other citizens, know the law; in this case, because of their repeated references to Title VI and its modes of enforcement, we are especially justified in presuming both that those representatives were aware of the prior interpretation of Title VI and that that interpretation reflects their intent with respect to Title IX.[12]

Further indication of legislative intent to create a remedy on behalf of innocent investors may be found in § 29 of the Securities Exchange Act of 1934.[13] Section 29(b) declares that contracts made in violation of the Act or a rule thereunder are void with respect to the rights of the violator. Section 29(c) specifically includes contracts for the extension of credit. Section 29(b) has been interpreted as making the contract voidable at the option of the innocent party. *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386–88, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). A 1938 amendment to § 29(b) added a statute of limitations. The amendment refers to "any action maintained in reliance upon this subsection," and thus makes it clear that Congress intended the original statute to be interpreted as providing a private remedy.[14]

*Cort*'s third inquiry is whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." 422 U.S. at 78, 95 S.Ct. at 2088. In amici briefs, both the Board of Governors of the Federal Reserve System and the Securities and Exchange Commission, the agencies primarily charged with regulation of the securities market and the

nation's resources of credit, have told us that private suits are necessary to effectuate the margin regulations. Without belaboring this point, it is sufficient to note that no sound reasons have been advanced for doubting this advice.

The appropriateness of allowing a private right of action is also illustrated by the Official Draft of the Federal Securities Code, which was approved by the American Law Institute in 1978, subject to the authority of the Reporter to make editorial and technical changes. The eminence of its Reporter and the ability and experience of his advisors assure the Draft's acceptance as informed commentary, although it has not yet been enacted into law. The Draft provides:

A lender or other person who violates a rule under section 918 limiting the amount of permissible credit is liable to the borrower for (1) the interest paid (including any amount charged by way of discount) and (2), in the court's discretion on consideration of the circumstances (including the conduct of the parties and the amounts involved) and the purposes of this Code (including the deterrent effect of liability), an additional amount not in excess of (A) twice the interest paid or accrued (including any amount charged by way of discount) and (B) the difference between the borrower's trading losses and any trading losses that he would have suffered in the absence of the violation.[15]

Sections 918(b) and (d) of the Draft, which track §§ 7(c) and (f) of the Act, make it unlawful for brokers to extend credit in contravention of the Board's rules and for investors to obtain such credit. Section 1725(d) of the Draft subjects an investor's

---

**12.** – – U.S. at ——, 99 S.Ct. at 1958.

**13.** 15 U.S.C. § 78cc (1976).

**14.** The fact that the appellant did not base his cause of action on § 29(b) does not detract from the significance of this section in assessing *Cort*'s second criterion, that is, whether or not there is any indication of legislative intent

to create or deny a private remedy. The parties, the Federal Reserve Board, and the Securities and Exchange Commission briefed the import of this section.

**15.** ALI Fed.Sec.Code § 1716(a) (Mar. 1978 Draft).

claim to the defense of *in pari delicto*.[16] It is apparent, therefore, that the Draft recognizes the utility of private suits in the legislative scheme to regulate credit.[17]

Finally, *Cort* asks "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U.S. at 78, 95 S.Ct. at 2088. There is little controversy over this inquiry. Margin requirements are determined nationally. Thus, a federal cause of action does not intrude on an area traditionally reserved to the states.

Accordingly, I would reverse the district court's holding that an investor, regardless of his innocence, has no private remedy against his broker for violations of § 7 and Regulation T.

I am less concerned about the second ground assigned by the majority for its affirmance of the district court. The evidence may ultimately show that Dr. Stern was not an innocent investor and therefore should not be allowed to recover on the merits of his claim. The district court, however, made no findings on this aspect of the case. Merrill Lynch contends that it did not violate the margin requirements. Consequently, I would remand these issues, which involve questions of fact, inferences, and credibility, to the district court.

---

**16.** Section 1725(d) provides that:

In a private action created by or based on a violation of this Code (as defined in section 225), the defenses of unclean hands and in pari delicto are valid only to the extent (which may be complete) that it is so determined on consideration of (1) the deterrent effect of the particular type of liability, (2) the financial and legal sophistication of the parties, and (3) their relative responsibility for the loss incurred.

**17.** *See* notes following § 1716 (Mar. 1978 Draft) and § 1414 (Tent. Draft No. 2, 1973) of the ALI Fed.Sec.Code. Although the Draft is a code and not a restatement, I believe that by recognizing private causes of action for margin violations, it makes explicit what Congress implicitly intended when it enacted § 7(c), as amended by § 7(f).